UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

DEBORAH TURBEVILLE,       )
                                 )
       Plaintiff,        )
                                 )      No. 1:05-CV-107
v.                            )
                                 )      DISTRICT JUDGE EDGAR
                                 )      MAGISTRATE JUDGE LEE
JO ANNE B. BARNHART,       )
Commissioner of Social Security,   )
                                 )
       Defendant.        )

## REPORT AND RECOMMENDATION

This action was instituted by the plaintiff Deborah Turbeville ("Plaintiff") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying the Plaintiff a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423 ("the Act"). This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a report and recommendation regarding the disposition of Plaintiff's motion for summary judgment [Doc. No. 10] and Defendant's motion for summary judgment [Doc. No. 17].

For the reasons stated herein, it is **RECOMMENDED** that: (1) the decision of the Commissioner be **AFFIRMED**; (2) the Defendant's motion for summary judgment [Doc. No. 17] be **GRANTED**; (3) the Plaintiff's motion for summary judgment [Doc. No. 10] be **DENIED**; (4) the Plaintiff's motion for a judgment by default [Doc. No. 20] be **DENIED**; (5) the Plaintiff's motion for sanctions [Doc. No. 27] be **STRICKEN** as having been rendered **MOOT**; and (6) the case be **DISMISSED**.

## Administrative Proceedings

Plaintiff applied for a period of disability and DIB under the Act, with a protective filing date of June 12, 2002 (Tr. 74-77). She alleged she became disabled beginning on October 31, 1995 (Tr. 75). Her application was denied initially and on reconsideration (Tr. 47-49, 52-53). After a hearing, at which Plaintiff waived her right to counsel (Tr. 73, 295-96), the administrative law judge ("ALJ") issued an unfavorable decision of Plaintiff's DIB claim (Tr. 9-16). The ALJ's decision, dated September 17, 2004, became final when the Appeals Council denied Plaintiff's request for a review (Tr. 4).

In his written decision, the ALJ declined to reopen a prior decision concerning Plaintiff's January 13, 1999[1] DIB application (Tr. 12). The ALJ applied the doctrine of administrative *res judicata* to the prior decision that Plaintiff was not disabled during the period of October 31, 1995 through the date of the prior decision on December 13, 1999 [*id.*]. With regard to the period from December 14, 1999 through March 31, 2001, when Plaintiff's DIB insured status expired, the ALJ found Plaintiff retained the residual functional capacity ("RFC") for sedentary work, with the provision she have the opportunity to alternate between sitting and standing (Tr. 13-15, 78-79). Based on Plaintiff's RFC, the ALJ found she could not perform her past relevant work (Tr. 15). However, considering Plaintiff's age, education, and work experience in combination with her RFC, the ALJ found Plaintiff was not disabled prior to the date her DIB insured status expired because she could perform a significant number of jobs in the economy (Tr. 15).

---

[1] The ALJ's unfavorable decision of December 13, 1999 became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review (Tr. 45, 337, 339).

## **Standard of Review**

The Court must determine whether the ALJ failed to apply the correct legal standard and whether the ALJ's findings of fact were unsupported by substantial evidence. 42 U.S.C. § 405(g); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). "This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the Court might have decided facts differently, or if substantial evidence also would have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not re-weigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y of Health & Human Servs.*, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The Court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The Court of Appeals for the Sixth Circuit ("Sixth Circuit") has held that substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner*, 745 F.2d at 388 (citation omitted).

## How Disability Benefits Are Determined

Disability is defined as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that disability claims are evaluated by way of a five-step sequential analysis. 20 C.F.R. § 404.1520. The five-step analysis is sequential because if, at any step, the claimant is found to be not disabled or to be disabled, then the claim is reviewed no further. 20 C.F.R. § 404.1520(a). The following are the five steps in the analysis:

Step 1: Is claimant engaged in substantial gainful activity? If so, claimant is not disabled. 20 C.F.R. § 404.1520(b).

Step 2: Does claimant have a "severe" impairment or combination of impairments that significantly limits claimant's ability to do basic work activities, and will foreseeably result in death or last at least twelve months? If not, claimant is not disabled. 20 C.F.R. §§ 404.1509, 404.1520(c), 404.1521.

Step 3: Does the claimant's impairment meet or equal the criteria of an impairment described in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, Appendix 1? If so, the claimant is disabled, and the analysis may end without inquiry into the vocational factors. 20 C.F.R. § 404.1520(d). If inquiry is made into vocational factors, then after step three but before step four, the Commissioner evaluates a claimant's RFC. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545.

Step 4: Does claimant's RFC permit claimant to perform claimant's past relevant work? If so, the claimant is not disabled. 20 C.F.R. § 404.1520(f).

Step 5: Does the claimant retain the RFC to perform other work in the economy?

If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

The burden of proof is upon the claimant at steps one through four to show disability. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999). Once the claimant has demonstrated the extent of claimant's RFC at step four, the burden shifts to the Commissioner to show that there is work in the national economy that may accommodate claimant's RFC. *Id.*

### ALJ's Findings

The ALJ made the following findings in support of Commissioner's decision, which are conclusive if they are supported by substantial evidence in the record:

1.    The claimant met the disability insured status requirements of the Act on March 31, 2001.

2.    The claimant has not engaged in substantial gainful activity since December 13, 1999.

3.    The claimant has "severe" impairments, as described in the decision, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.    The claimant's subjective complaints are not fully credible.

5.    The claimant has the residual functional capacity described above in the decision.

6.    The claimant is unable to perform any past relevant work and has no transferable work skills.

7.    The claimant was 46 years old, on December 13, 1999, which is defined as a younger individual.

8.    The claimant has a high school education.

9.    Based on an exertional capacity for sedentary work and the claimant's age, education, and work experience, 20 C.F.R. § 404.1569 and Rule 201.21, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

5

10.    Although the claimant's additional nonexertional limitations do not allow the claimant to perform the full range of light work, using the above-cited rule as a framework for decisionmaking, there are a significant number of jobs in the national and regional economies which the claimant could perform. Examples and numbers of such jobs were identified by a vocational expert at the hearing.

11.    The claimant has not been under a "disability" as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 15-16).

## **Issues Presented by Plaintiff**

Plaintiff contends she was denied procedural due process because:

(1)    The ALJ allegedly told Plaintiff she was approved for benefits, but then denied benefits without giving Plaintiff notice and an opportunity to respond;

(2)    The ALJ allegedly expressly reopened the Plaintiff's prior claim for disability and informed Plaintiff the prior claim was reopened and the doctrine of *res judicata* would not apply to her case, but then changed that decision without giving Plaintiff an opportunity to respond;

(3)    The ALJ allegedly included evidence in the administrative record without proffering it to Plaintiff for an opportunity to respond or other factual development; and

(4)    The Commissioner allegedly failed to properly answer and include all the proof in the administrative record.

[Doc. No. 11 at 2].

6

*Plaintiff's Age, Education, and Past Work Experience*

Plaintiff was "younger person" at all times prior to the expiration of her DIB insured status on March 31, 2005 (Tr. 50, 75). She reports a high school education and past work experience as a core processor, seed machine tender, cashier/checker, store laborer, and convenience store manager (Tr. 85, 90, 313-14). She alleges disability due to carpal tunnel syndrome, a hernia, arthritis, and blood clots (Tr. 84).

*Medical Evidence Prior to the Expiration of Plaintiff's Insured Status*

The accuracy of the summary of the medical evidence provided by the Commissioner [Doc. No. 18 at 3-10] has not been challenged by Plaintiff. As summarized by the Commissioner, in early 1995, Clifford L. Posman, M.D. diagnosed Plaintiff as having severe right carpal tunnel syndrome, and he performed a right endoscopic carpal tunnel release (Tr. 441-43). Plaintiff continued to complain of right wrist pain and occasional numbness and tingling in her right hand, which Dr. Posman treated with steroid injections, a night splint, a work splint, and medication (Tr. 434-35). In mid 1995, Plaintiff stated her right hand pain had leveled off, but she began having pain in her left hand (Tr. 434). Dr. Posman diagnosed tenosynovitis in both hands and mild left carpal tunnel syndrome (*id.*). On August 8, 1995, Plaintiff was released to work without restrictions (Tr. 433), but Plaintiff continued to complain of decreased sensation in both hands. On October 24, 1995, Dr. Posman diagnosed persistent tenosynovitis with a component of mild carpal tunnel syndrome on the right, due to the repetitive nature of Plaintiff's work, and he opined the condition would not improve until she changed jobs, and he restricted her to lifting ten pounds, no more than 32 repetitions an hour or more than four hours of repetitive hand movements in an eight-hour shift (Tr. 178, 432).

7

On December 6, 1995, Plaintiff reported she had not been working because her employer did not have work within the restrictions indicated by Dr. Posman (Tr. 431). Dr. Posman opined Plaintiff was at maximum medical improvement and would retain 10% permanent impairment to her right upper extremity, but would have no permanent impairment to her left hand (*id.*). He again restricted her to lifting ten pounds with no repetitive use of her upper extremities for more than four hours in an eight-hour shift and recommended vocational rehabilitation (*id.*).

About one year later, on January 14, 1997, Dr. Posman noted a dorsal ganglion cyst on Plaintiff's right wrist, decreased sensation in the fingers of both hands, continued decreased grip strength, and mild thenar atrophy on the right (Tr. 179, 430). He diagnosed right carpal tunnel syndrome and questionable right ulnar neuropathy and referred Plaintiff to a clinic for comprehensive evaluation and nerve conduction studies of both hands -- electrodiagnostic testing (Tr. 176, 179, 430). Nerve conduction/electromyogram ("EMG") studies showed mild bilateral carpal tunnel syndrome and mild demyelinating peripheral neuropathy, but no ulnar neuropathy (Tr. 176). On March 5, 1997, Dr. Posman noted Plaintiff lacked ten degrees of extension in her right wrist and had full motion in her left wrist with grip strength of 30 pounds on the right and 35 pounds on the left (Tr. 175, 429).

Not quite two years later, Dr. Posman saw Plaintiff on January 25, 1999, and noted the ganglion cyst on her right wrist was minimally tender, and there was decreased sensation in the first three fingers, but wrist motion was full and painless (Tr. 174, 428). Dr. Posman diagnosed mild right carpal tunnel syndrome with a history of polyneuropathy and symptomatic dorsal ganglion, and he injected the wrist with Kenalog (*id.*). On February 12, 1999, he excised the ganglion cyst (Tr. 427). On February 22, 1999, he prescribed Darvocet and reported nearly normal right wrist motion

(Tr. 173, 426). On March 8, 1999, Plaintiff complained of some soreness but no significant pain (Tr. 172, 425).

On March 30, 1999, a state agency physician, Dr. Hamsaveni Kambam, reviewed the evidence submitted in connection with Plaintiff's January 1999 DIB application and concluded Plaintiff could lift 20 pounds occasionally and ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and perform unlimited pushing/pulling (Tr. 415-16). Plaintiff had no postural, visual, communicative, environmental, manipulative, or other work-related limitations (Tr. 418-19).

On May 24, 1999, Dr. Posman again injected Kenalog and prescribed Darvocet, as Plaintiff complained of numbness in her right wrist, as well as right wrist pain with activities like peeling potatoes (Tr. 171, 424). There was no recurrence of the cyst and wrist motion was full, but there was some swelling about the right wrist, decreased sensation in four of her fingers, and grip strength of 25 pounds, as compared to 35 pounds on the left (*id.*).

Nerve conduction studies of both upper extremities conducted on June 24, 1999 were normal, with no evidence of peripheral polyneuropathy or focal nerve entrapment syndrome (Tr. 161-63). When Plaintiff saw Dr. Posman on June 21, 1999, she reported the steroid injection in May was not helpful, and she still had pain throughout the entire right hand radiating into her forearm and occasionally to the elbow (Tr. 170).

On July 7, 1999, another state agency physician, Dr. Helena P. Perry, reviewed the evidence submitted in connection with Plaintiff's January 1999 application and opined Plaintiff could lift 20 pounds occasionally, ten pounds frequently, stand and/or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and perform unlimited pushing/pulling, with no postural

limitations or other limitations, except for a limitation to occasional feeling with the right hand (Tr. 444-51).

On July 12, 1999, Dr. Posman's noted his impression of non-specific right hand pain with no carpal tunnel or peripheral neuropathy (Tr. 169). He referred Plaintiff to a pain clinic (*id.*).

Dr. Maurice Charitat first saw Plaintiff for her right hand pain on December 16, 1999 (Tr. 157). An ulnar nerve block at the right wrist on January 19, 2000 provided significant pain relief for at least a couple of days (*id.*). Dr. Charitat administered a second nerve block on February 18, 2000, and Plaintiff reported her pain was essentially gone within 15 minutes (*id.*). Plaintiff was instructed to increase her Neurontin to four times a day (*id.*). On February 28, 2000, Dr. Posman noted x-rays of Plaintiff's right wrist showed no definite fracture or osteoarthritis and Plaintiff had full wrist motion (Tr. 168).

Treating physician Dr. Yung G. Lee treated Plaintiff for a sore throat, right knee pain, and hot flashes in July 1999 (Tr. 254-55).[2] Plaintiff was taking Celebrex for pain, as well as a thyroid medication and hormone replacement therapy drug (Tr. 255). On September 29, 1999, Plaintiff had surgery for an abdominal hernia (Tr. 194). After endoscopy in January 2000, Plaintiff was diagnosed with gastroesophageal reflux disease ("GERD") and antral gastritis (Tr. 190, 192, 248). On February 21, 2000, Plaintiff told Dr. Lee that Tagamet was helping her GERD, but she complained of pain in her low back and both legs (Tr. 245).

A whole body bone scan, on March 2, 2000, indicated likely degenerative arthritis changes in Plaintiff's shoulders, knees, and right foot (Tr. 156). On March 13, 2000, Dr. Posman reviewed the results of the whole body bone scan and recommended continued treatment at the pain clinic,

---

[2] Many details of Dr. Lee's records were difficult to read because of poor copy quality.

including nerve blocks, which were providing some relief (Tr. 167). On May 8, 2000, Dr. Charitat noted Plaintiff's pain was improved with Neurontin and ulnar nerve blocks (Tr. 155). On examination, Plaintiff had pain with palpation over the ulnar nerve in her wrist, and Dr. Charitat's impression was ulnar neuropathy (*id.*). He added Neurontin cream to her medications and recommended continued conservative therapy (*id.*).

In April 2000, Dr. Lee prescribed antibiotics, after Plaintiff complained of soreness in her right abdomen and groin area over the past month or so (Tr. 240). Surgical excision of a large abdominal wall abscess due to infected epidermoid cysts was performed in July 2000 (Tr. 186-87, 241). On August 9, 2000, Dr. Lee treated Plaintiff for a post-surgical complication (Tr. 236).

On August 11, 2000, Dr. Posman diagnosed cubital tunnel syndrome of the right upper extremity (Tr. 166). On August 18, 2000, nerve conduction studies on Plaintiff's right upper extremity were normal (Tr. 160). After examining Plaintiff again on August 28, 2000, Dr. Posman recommended symptomatic treatment from the pain clinic (Tr. 165). He concluded Plaintiff had mild ulnar neuropathy, despite normal nerve conduction study findings (*id.*).

On September 15, 2000, Plaintiff underwent surgical debridement and skin graft in connection with her earlier abdominal wall infection and necrosis (Tr. 183). On October 30, 2000, Plaintiff told Dr. Posman her right upper extremity pain was "much better" with Neurontin and Elavil, but she still had occasional numbness in the little finger of her right hand (Tr. 164). Elbow and wrist motion were full, there was no muscle wasting, and sensation was mildly decreased in the right little finger but normal in the other fingers (*id.*).

Dr. Lee's treatment note, dated November 2, 2000, contains a diagnosis of Reynaud's disease after Plaintiff complained of pain in her legs (Tr. 231, 235). An arterial ultrasound of Plaintiff's left

lower extremity indicated abnormal flow in the common femoral artery suggesting moderately severe disease (Tr. 182). Plaintiff continued to complain of left leg pain in January 2001, when she saw Dr. Lee for follow-up on her abdominal skin graft (Tr. 228). Dr. Lee prescribed antibiotics for a sore on Plaintiff's left foot (*id.*).

On January 23, 2001, Dr. Charitat noted Plaintiff reported a significant decrease in her right hand and wrist pain for periods of up to four to five weeks after her ulnar nerve blocks (Tr. 213). Plaintiff was taking Elavil, Neurontin, and Naprosyn, and she reported significant benefit from Neurontin cream and a side effect of dry mouth from taking Elavil (*id.*). On January 26, 2001, Plaintiff had hernia repair surgery (Tr. 180-81). In March 2001, Dr. Lee noted the abdominal incision was healed and there were no gastric complaints (Tr. 227). He checked Plaintiff's left foot and refilled prescriptions for antibiotics and ibuprofen (*id.*).

### Medical Evidence After the Expiration of Plaintiff's Insured Status

It is undisputed that Plaintiff's insured status expired March 31, 2001. After her insured status expired, Dr. Charitat continued to treat Plaintiff for pain in her left arm, from her wrist to her elbow (Tr. 211). On April 16, 2001, he noted she was relatively pleased with the amount of analgesic control (Tr. 202, 211). In October 2001 and June 2002, he noted Plaintiff's medications made her pain very tolerable and allowed her to do the activities she enjoyed (Tr. 202, 207).

In May 2001, Plaintiff complained of pain in both legs, and Dr. Lee noted a history of deep venous thrombosis (Tr. 226). Dr. Lee continued to treat Plaintiff for upper respiratory problems and pain in her legs (Tr. 215-26). An arterial lower extremity ultrasound on September 12, 2001 demonstrated findings compatible with severe arterial disease extending from the femoral popliteal area, more in the left leg than the right leg (Tr. 200). Dr. Lee referred Plaintiff to a vascular surgeon

12

(Tr. 219). Dr. Lee's treatment notes for October 5, 2001 and February 12, 2002 indicate upper respiratory complaints but no leg pain (Tr. 217, 220). On June 17, 2002, however, Plaintiff complained of swelling in her feet and legs over the preceding week (Tr. 215).

Vascular surgeon David Cassada, M.D. began treating Plaintiff on October 21, 2002, at which time he noted Plaintiff had a history of bilateral lower extremity claudication for greater than three years duration (Tr. 289). He wrote:

> Recently, it has become debilitating with her only being able to walk a short distance without having to take a break. She underwent PTA and stenting of the right iliac in 2000 and had relief thereafter however with continued smoking and failure to modify her risk factors she had recurrence of her prior symptoms and progression of her disease.

(*id.*). Plaintiff reported she was able to walk 20 feet before needing to take a break due to leg pain (*id.*). After examining Plaintiff, Dr. Cassada diagnosed, *inter alia*, severe peripheral vascular disease and life-limiting claudication (Tr. 290).

Plaintiff underwent an aortogram, angioplasty, and placement of right common iliac stent and two left common iliac stents in October 2002 (Tr. 287). On November 5, 2002, Dr. Cassada performed surgery again for Plaintiff's left femoral artery stenosis with left lower extremity claudication (Tr. 274). In April 2003, he performed femoral bypass surgery (Tr. 270, 271-72).

Dr. Cassada completed a questionnaire on April 28, 2003, opining Plaintiff was able to lift 20 pounds occasionally and frequently, stand and/or walk less than two hours in an eight-hour workday, and perform occasional climbing, kneeling, crouching, crawling, and stooping (Tr. 261-62). Dr. Cassada opined Plaintiff's impairment did not affect her ability to sit, push/pull, and balance (Tr. 261-62). Dr. Cassada also opined Plaintiff had no limitation of her ability to reach, handle objects, perform fine manipulation, or feel with either upper extremity and had no visual,

13

communicative, or environmental limitations (Tr. 263-64). Dr. Cassada also completed a mental assessment of Plaintiff's ability to engage in work-related activity, and found no such limitation from a mental standpoint (Tr. 265-66).

***The Hearings***

Plaintiff appeared at two hearings before the ALJ. At the first hearing on July 29, 2003, Plaintiff told the ALJ, "Well, I actually filed back in '99 – but they said that they sent me a decision that I didn't get then because I refused to go to a hearing. I never got a paper about going to a hearing and I had papers showing that I had signed that I wanted to go to a hearing." (Tr. 328). In addressing Plaintiff's prior 1999 application, the ALJ told the Plaintiff the Appeals Council had found no basis to overturn the ALJ's 1999 decision and Plaintiff had waived her right to appear at a hearing in 1999 (Tr. 328). He indicated he would get all the files in Plaintiff's case and consider whether to reopen the prior application (Tr. 329). The ALJ stated, "And if we find that you did wish to appear at a hearing but there was some error on our part, I'll reopen it. If not, you would need to come up with new and material evidence which would allow a reopening of that matter, and at this point I don't particularly see it" (*Id.*). The ALJ indicated he would send for the prior file and see if the claim could be reopened (Tr. 331). The merits of Plaintiff's claim were not addressed during the hearing in order to avoid "piecemeal" consideration of the issues (*id.*).

Plaintiff appeared at a second hearing before the same ALJ on December 11, 2003 and waived her right to representation (Tr. 73, 295-96). In again discussing whether the Plaintiff had previously waived a hearing for the 1999 claim, the ALJ noted he had a form stating Plaintiff did "not care to come to a hearing," but he was "willing to listen to the whole -- taking back as far as you like on this" apparently because the form was not signed or dated (Tr. 298-99). With regard to

14

her prior application for DIB, Plaintiff stated, "I had papers showing that I wanted to come to a hearing, that it was dismissed once . . ." (Tr. 298). Noting Plaintiff claimed a disability onset date of October 31, 1995 on her current application, the ALJ stated, "Let's take the whole case – from square one" (Tr. 299).

She testified her last job was as a core processor, rebuilding motors (Tr. 309). She did not think she could work because she was not strong enough to stand or sit long enough (Tr. 299, 320). She stated her knees bothered her, her legs swelled, and she had to wear support stockings (Tr. 299). She told the ALJ, "most of the problem now is in my feet." (*Id.*). Plaintiff related she had surgery on her legs in April 2003 (Tr. 300). She stated, "My legs was in such bad shape where he's done all the surgery on them, I could not go to the grocery store without being in pain by the time I got out." (*Id.*). Plaintiff told the ALJ that her legs had been bothering her for the past three or four years (Tr. 301). Plaintiff stated she still had swelling and cramping in both feet, but she was able to walk with difficulty (Tr. 303). Plaintiff testified that she also sustained an injury to her hands in 1994 and, ever since the injury she had weakness in her hands and difficulty holding anything for long periods because of peripheral neuropathy (Tr. 301-02). Plaintiff was using Neurontin cream for her hands and going to a pain clinic (Tr. 302).

Plaintiff told the ALJ her husband helped, but she also did some of the cooking (Tr. 304, 306). She did housework when needed, and she made the bed every other day (Tr. 306). Plaintiff sometimes traveled to the town of Athens to visit her daughter and her ten month old granddaughter (Tr. 304). She took her elderly neighbor to the neighbor's doctors visits and, when necessary, she went grocery shopping (Tr. 305).

Vocational expert Mark Boatner ("VE") identified Plaintiff's past relevant work as that of

15

core processor (semi-skilled, medium exertion), seed machine tender (unskilled, medium exertion), cashier/checker (semi-skilled, light exertion), store laborer (unskilled, medium exertion), and convenience store manager (skilled, light exertion) (Tr. 313-14). When asked if Plaintiff could do any jobs given the limitations stated in Dr. Cassada's assessment (Tr. 261-66), the VE responded Plaintiff would not be able to perform her past relevant work, but she would be capable of performing 137 sedentary unskilled occupations, for which there were tens of thousands of jobs in the Chattanooga region and several million jobs in the national economy, including the occupations of check/weigher (610 jobs in the region and 114,000 jobs nationwide) and small product assembler (745 jobs in the region and 183,000 jobs nationwide) (Tr. 315-18).

After much of the testimony, the ALJ commented:

> It would appear that up until the age of 50, which you've, you've just turned 50, up to that point, you were, according to your own doctor, you could have done sedentary jobs. Essentially a sit down job. And it would appear that there are, you know, it was a substantial number of those jobs available.
> . . .
> However, what I'm going to do with this case is – I'm going to, I'm going to grant benefits. I'm not going to go all the way back to '95, I don't see any justification for that . . . . You start in 2001. It's not showing signs of moderate neuropathy in the left lower extremity and that apparently does progress, and you have to have, you have to have both – and it looks to me like it's not resolved yet. Doctor wants to see you back in six months to see where you stand.

(Tr. 320-22).

Plaintiff then told the ALJ that she had tests done in May and had seen Dr. Cassada in November 2003 (Tr. 322-23). The ALJ responded that he would write to Dr. Cassada for an updated report (Tr. 323). He then added, "So I'll hold up on making a judgment call . . . But at this point I won't make you a promise, I'm inclined to grant benefits. I'm inclined, okay. So don't read any

16

more of that . . . as I feel right now I'm probably going to say yes but let me look at . . .we'll take this under advisement" (Tr. 323-25). A request for Plaintiff's medical records subsequent to May, 2003 was sent to Dr. Cassada by the ALJ on January 8, 2004 (*see* Tr. 143).

***Medical Evidence Submitted After the Hearing***

Dr. Cassada's note dated May 27, 2004 stated Plaintiff was doing reasonably well but still had some burning sensation in her feet consistent with neuropathy, and she had no complaints referable to her surgery or vascular disease and denied neurological complaints, including numbness, weakness, drop attacks, visual changes, difficulty speaking, or changes in her feet (Tr. 291). On examination, Plaintiff's lungs were clear, her heart sounds were regular, her incisions were nicely healed, and her lower extremities were well perfused, and Dr. Cassada's impression was Plaintiff's progress was stable (*id.*).

**Analysis**

Plaintiff's claims relate to the Commissioner's alleged violation of her procedural due process rights. Before turning to Plaintiff's due process claims, however, the Court will address whether substantial evidence in the record supports the ALJ's determination.

***Substantial Evidence***

The Court finds substantial evidence supports the ALJ's decision that during the time period of December 14, 1999 through March 31, 2001, Plaintiff retained the RFC for a significant number of jobs in the economy. The ALJ noted Plaintiff retained the RFC for at least sedentary work, finding the medical records did not support debilitating impairments during the relevant time period (Tr. 14-15). There is no indication of a lower extremity vascular impairment or significant complaints of leg pain prior to the November 2000 arterial ultrasound which demonstrated abnormal

17

flow in the femoral artery (Tr. 182). It was not until September 2001, when a second arterial ultrasound showed more severe arterial disease, that Plaintiff's treating physician considered her lower extremity impairment significant enough to refer her to a vascular specialist (Tr. 200, 219). It was not until October 21, 2002 that Plaintiff began seeing a vascular specialist, Dr. Cassada, for her leg problem (Tr. 289). At that time, Plaintiff indicated her condition had only recently become "debilitating" such that she was able to walk only short distances without a break (*Id.*).

Thus, substantial evidence supports the ALJ conclusion the medical evidence prior to March 31, 2001 did not show severe arterial and peripheral vascular disease (Tr. 14). The ALJ found the medical evidence and Plaintiff's reported activities did not support her claim of total disability but were consistent with the capacity for at least sedentary work with a sit/stand option (Tr. 14-15). As argued by the Commissioner, the substantial evidence supports the ALJ's findings that Plaintiff's ulnar neuropathy was mild and she recovered from her hernia surgery during the relevant time period, and that Plaintiff's upper extremity impairments, lower extremity arterial disease, and abdominal impairments did not preclude all work activity before March 31, 2001 (Tr. 14). As the ALJ noted, Plaintiff reported performing some household chores, at least on an occasional basis, as well as activities such as driving and visiting family members, and her activities of daily living provide support for the RFC finding (Tr. 14-15, 304-06).

The ALJ found Plaintiff was capable of performing a significant number of jobs in the economy (Tr. 15). The VE testified a person with Plaintiff's vocational characteristics and the capacity for sedentary work with a sit/stand option could perform 137 occupations, for which there were tens of thousands of jobs in the region and several million jobs nationwide (Tr. 313-18). The VE's testimony constitutes substantial evidence in support of the ALJ's decision. *See Hardaway*

18

*v. Sec' of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987) (where hypothetical question is supported by the evidence in the record, ALJ is entitled to rely on vocational expert's testimony that such a person can perform certain jobs). Therefore, unless Plaintiff establishes a violation of her due process rights, the decision of the ALJ should be affirmed.

**Due Process Claims Regarding Plaintiff's Prior DIB Application**

In his written decision, the ALJ expressly refused to reopen Plaintiff's prior claim, and applied the doctrine of administrative *res judicata* to the issue of disability from Plaintiff's alleged disability onset date of October 31, 1995 through the date of the prior decision, December 13, 1999 (Tr. 12). The ALJ did not re-evaluate or discuss the medical evidence related to Plaintiff's impairments prior to December 13, 1999 because he found the time period relevant to his decision began on December 14, 1999 (Tr. 13-14). Plaintiff argues these actions of the ALJ deprived her of procedural due process rights to notice and an opportunity to comment or offer argument [Doc. No. 11 at 5-6]. In response, the Commissioner argues that the ALJ's refusal to reopen the Plaintiff's prior application is not subject to judicial review and, in any event, the ALJ did not expressly reopen the prior application during the hearing [Doc. No. 18 at 14-19].

The Court agrees with the Commissioner's argument that the ALJ did not expressly reopen the Plaintiff's prior application at either the July 29 or December 11, 2003 hearings. Instead, at the conclusion of the July hearing, the ALJ indicated he would obtain the file on Plaintiff's prior claim and "see if we can reopen it and deal with the whole thing all at once" (Tr. 331). The ALJ did not expressly state he was reopening the claim. Subsequently, at the December hearing (after he obtained the file), the ALJ indicated he would allow Plaintiff to testify about her impairments as far back as she would like (Tr. 298). While the ALJ stated he would "take the whole case -- from

19

*v. Sec' of Health & Human Servs.*, 823 F.2d 922, 927-28 (6th Cir. 1987) (where hypothetical question is supported by the evidence in the record, ALJ is entitled to rely on vocational expert's testimony that such a person can perform certain jobs). Therefore, unless Plaintiff establishes a violation of her due process rights, the decision of the ALJ should be affirmed.

**Due Process Claims Regarding Plaintiff's Prior DIB Application**

In his written decision, the ALJ expressly refused to reopen Plaintiff's prior claim, and applied the doctrine of administrative *res judicata* to the issue of disability from Plaintiff's alleged disability onset date of October 31, 1995 through the date of the prior decision, December 13, 1999 (Tr. 12). The ALJ did not re-evaluate or discuss the medical evidence related to Plaintiff's impairments prior to December 13, 1999 because he found the time period relevant to his decision began on December 14, 1999 (Tr. 13-14). Plaintiff argues these actions of the ALJ deprived her of procedural due process rights to notice and an opportunity to comment or offer argument [Doc. No. 11 at 5-6]. In response, the Commissioner argues that the ALJ's refusal to reopen the Plaintiff's prior application is not subject to judicial review and, in any event, the ALJ did not expressly reopen the prior application during the hearing [Doc. No. 18 at 14-19].

The Court agrees with the Commissioner's argument that the ALJ did not expressly reopen the Plaintiff's prior application at either the July 29 or December 11, 2003 hearings. Instead, at the conclusion of the July hearing, the ALJ indicated he would obtain the file on Plaintiff's prior claim and "see if we can reopen it and deal with the whole thing all at once" (Tr. 331). The ALJ did not expressly state he was reopening the claim. Subsequently, at the December hearing (after he obtained the file), the ALJ indicated he would allow Plaintiff to testify about her impairments as far back as she would like (Tr. 298). While the ALJ stated he would "take the whole case -- from

square one" (Tr. 299), he did not state that he was reopening her prior application.

In *Girard v. Chater*, 918 F. Supp. 42, 44 (D. R.I. 1996), the court rejected the contention the ALJ "constructively" reopened the plaintiff's prior application for benefits because he considered evidence relating to the prior application. The *Girard* court stated:

> A prior disability claim is not deemed to have been reconsidered on the merits merely because the evidence reviewed by the ALJ included evidence of the claimant's condition at the time of the previous application. An ALJ "is entitled to consider evidence from a prior denial for the limited purpose of reviewing the preliminary facts or cumulative medical history necessary to determine whether the claimant was disabled at the time of his second application. *Frustaglia v. Secretary of Health and Human Services*, 829 F.2d 192, 193 (1st Cir. 1987). Indeed, § 423(d)(5)(B) requires the ALJ to "consider all evidence available in such individual's case record." *See McGowen* [*v. Harris*], 666 F.2d [60], 67 [4th Cir. 1981]. Furthermore, it may be necessary to consider evidence regarding the claimant's condition at the time of the previous denial in order to determine whether the second claim is the "same" as the first claim for *res judicata* purposes. If simply reviewing evidence relating to a previous claim is viewed as a reconsideration on the merits, the previous case would be constructively reopened virtually every time a successive claim is filed. *See McGowen*, 666 F.2d at 67-68. That would create what has been described as a "quintessential Catch-22" situation because "[e]very time a claimant petitioned the agency to reopen an old claim based on newly submitted evidence, the agency would be faced with a choice: Looking at the evidence to determine if it really is new and material, thereby risking a whole new round of appeals, or blindly denying the petition so as to avoid judicial review." *Morris v. Sullivan*, 897 F.2d 553, 559 (D.C. Cir. 1990).
>
> Similarly, a claim is not deemed to have been reconsidered on the merits solely because the ALJ reviewed new evidence of the claimant's condition at the time of the previously denied application. Such review may be necessary to determine whether there is "good cause" to reopen. *See id.* Thus, the mere fact that new evidence is considered does not amount to a constructive reopening particularly when the ALJ expressly refuses to reopen. *See McGowen*, 666 F.2d at 67-68.

*Girard*, 918 F. Supp. at 44-45. *See also Brewster v. Barnhart*, 145 Fed. Appx. 542, 548-49 (6th Cir.

Aug. 16, 2005) (consideration of new evidence or analysis from a vocational expert for the purpose of deciding whether a prior finding should be reopened should not be construed as a *de facto* reopening of the prior decision); *Cash v. Barnhart*, 327 F.3d 1252, 1256-57 (11th Cir. 2003) (prior claim not reopened where Commissioner considered newly proffered evidence to extent required to determine if the two claims involved the same claims, facts, and issues, but he did not reconsider the merits of the previously denied application and expressly denied the claimant's request to reopen).

Under the agency's regulations, a decision may be reopened within 12 months of the initial determination for any reason, within four years of the initial determination for good cause[3], or at any time under certain specified circumstances, including that the decision was obtained by fraud or to correct a clerical error or an error that appears on the face of the evidence that was considered when the decision was made; and, it is within the ALJ's discretion whether to do so. 20 C.F.R. § 404.988; *Bogle v. Sullivan*, 998 F.2d 342, 346 (6th Cir. 1993). Plaintiff's prior application was initially denied on April 12, 1999 (Tr. 354), and the issue of reopening was first raised on July 29, 2003 (Tr. 326-31). However, Plaintiff filed her second application for DIB benefits on June 12, 2002 (Tr. 74-77), more than one year, but less than four years after the initial denial of her prior application. A second application for benefits can be construed as an attempt to reopen an earlier decision. *Wilson v. Califano*, 580 F.2d 208, 211-12 (6th Cir. 1978).

When the ALJ told Plaintiff he would "take the case from square one" (Tr. 299), he was not

---

[3] Good cause for reopening a prior determination or decision will be found if (1) new and material evidence is furnished; (2) a clerical error was made in the computation or recomputation of benefits; or (3) the evidence that was considered in making the prior determination or decision clearly shows on its face an error was made. 20 C.F.R. § 404.989(a).

expressly reopening the final determination on the Plaintiff's prior application for DIB benefits. Rather, as argued by the Commissioner, it appears the ALJ was allowing Plaintiff to present evidence so he could determine if there was "good cause" or other specified circumstances for reopening the final determination on the prior application. The record simply does not establish a clerical error, fraud or similar mistake to justify reopening under 20 C.F.R. § 404.988(c). Thus, assuming the ALJ found that Plaintiff's second application was a request to open the prior determination, the ALJ could only reopen the prior determination if he found "good cause" for the reopening. 20 C.F.R. § 404.988(b).

Generally, federal courts lack jurisdiction to review an administrative decision not to reopen a previous claim for benefits. *See Califano v. Sanders*, 430 U.S. 99, 107-08 (1977). An exception to this general rule exists where a refusal to reopen an application for benefits is challenged on constitutional grounds. *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231-32 (6th Cir. 1990) (citing *Califano*, 430 U.S. at 107-08). "Judicial review of a decision not to reopen a prior determination is available only when the [plaintiff] raises a colorable constitutional claim." *Popp v. Sec'y of Health and Human Servs*, No. Civ. A. 85-6099, 1988 WL 147419, * 1 (D. Kan. Sep. 26, 1988) (citing *Dvareckas v. Sec'y*, 804 F.2d 770, 771 (1st Cir. 1986) (per curiam); *accord Cherry v. Heckler*, 760 F.2d 1186, 1189 (11th Cir. 1985); *Elchediak v. Heckler*, 750 F.2d 892, 894 (11th Cir. 1985) (per curiam); *Penner v. Schweiker*, 701 F.2d 256, 260-61 (3d Cir. 1983); *Singer v. Schweiker*, 694 F.2d 616, 617 (9th Cir. 1982); *McGowen v. Heckler*, 666 F.2d 60, 65 (4th Cir. 1981); *Parker v. Califano*, 644 F.2d 1199, 1201 (6th Cir. 1981); *Howard v. Califano*, 590 F.2d 137, 138 (5th Cir. 1979) (per curiam)).

Whether a colorable constitution claim exists is a question of law for the court. *Popp*. 1988

WL 147419 at * 1 (citing *Willis v. Sec'y*, 802 F.2d 870, 873 (6th Cir. 1986)). Generally, where a claimant raises a constitutional challenge, the challenge must relate to the manner or means by which the agency decided not to reopen the prior decision, rather than to the merits of the prior decision or the means by which the prior decision was reached. *Panages v Bowen*, 871 F.2d. 91, 93 (9th Cir. 1989) (relying on *Weinberger v. Salfi*, 422 U.S. 749 (1975) and *Mathews v. Eldridge*, 424 U.S. 319 (1976)). For instance, "several courts have held that a claimant who suffers from mental illness raises a colorable due process claim when he alleges that . . . mental illness prevented him from litigating his claim . . . ." *Popp*, 1988 WL 147419, * 2 (citing *Willis*, 802 F.2d at 873; *Elchediak*, 750 F.2d at 894; *Penner*, 701 F.2d at 260-61; *Parker*, 644 F.2d 1203; *Shrader v. Harris*, 631 F.2d 297, 301-02 (4th Cir. 1980)).

Whether a claim that the ALJ violated a plaintiff's due process rights rises to the level of a colorable constitutional claim "depends upon the violation's impact upon the [plaintiff's] opportunity to be heard." *Doan v. Sec'y of Health and Human Servs*, 680 F. Supp. 1146, 1149 (S.D. Ohio 1987). "'Simply couching in constitutional language what is in reality an argument that the [Commissioner] abused h[er] discretion in refusing to re-open a claim does not convert the argument into a colorable constitutional challenge.'" *Kelly v. Apfel*, No. 97-6211, 1998 WL 833704, * 2 (6th Cir. Nov. 20, 1988) (quoting *Ingram v. Sec'y of Health and Human Servs.*, 830 F.2d 67, 67-68 (6th Cir. 1987)). In order to constitute an exception to the rule against judicial review of decisions not to reopen, a colorable constitutional claim must be supported by the record. *Okarski v. Comm'r of Social Security*, No.01-10239-BCBSA, 2004 WL 2713268, * 2 (E.D. Mich. Nov. 12, 2004).

Plaintiff argues the ALJ's decision not to reopen violated her procedural due process rights because she was not allowed to offer an explanation as to why her prior claim should be reopened

[Doc. No. 11 at 6-7]. Contrary to Plaintiff's argument, she had an opportunity to make her case for reopening. Plaintiff presented her explanation of the circumstances to the ALJ at the first hearing in July 2003, explaining that she had requested a hearing, had never been requested to attend a hearing, and had been told she had been sent a decision (Tr. 328). At the December 2003 hearing, Plaintiff stated she had requested a hearing in connection with her prior claim and her request had been dismissed (Tr. 298). The ALJ indicated he would not limit Plaintiff's testimony to the subsequent period and would allow her to take her testimony back "as far as you like on this" (Tr. 298). Thus, Plaintiff was not denied the opportunity to explain why her prior claim should be reopened.

The ALJ's decision demonstrates he considered Plaintiff's request to reopen the prior decision and declined her request. Thus, Plaintiff received the procedural due process to which she is entitled. *See Blacha*, 927 F.2d at 232 (citing *Bullyan v. Heckler*, 787 F.2d 417, 420 (8th Cir. 1986) for proposition that, where a request to reopen is not inextricably intertwined with the subsequent claim for benefits, due process requires only that the ALJ considered and rejected the possibility of reopening the prior claim).

To the extent Plaintiff's argument can be characterized as a contention the ALJ abused his discretion in refusing to reopen the prior claim, that argument also fails. *See Ingram.*, 830 F.2d at 67-68. On December 20, 1999, Plaintiff completed a request for Appeals Council review of the ALJ's 1999 decision (Tr. 339) indicating she was aware of the 1999 denial of benefits. While the completed waiver of the right to a hearing (Tr. 366) is not signed and dated, the request for Appeals Council review of the prior decision is signed and dated by the Plaintiff (Tr. 339). Her request for review in 1999 did not raise any challenge to the statement in the first paragraph of the 1999

decision that Plaintiff had "waived her right to an oral hearing and requested that a decision be made based on the evidence of record." (Tr. 339, 344). Therefore, Plaintiff's contention she was denied due process with respect to the ALJ's comments or treatment of her prior application for DIB benefits fails as her contention finds no support in the record.[4]

### Due Process Claims Concerning the ALJ's Comments About a Favorable Decision

Referring to *Alice's Adventures in Wonderland* instead of case law, the Plaintiff argues that, like Alice, she got her sentence (she allegedly was told at the hearing she would get benefits) and then she got her verdict (in the written decision she was told she was not disabled) [Doc. No. 11 at 3-4]. Literary references aside, Plaintiff contends she was denied procedural due process because the ALJ told her at the hearing she was approved for benefits, but he later denied her application without giving notice and the opportunity to comment or present argument [*id.*].

During the December 2003 hearing the following exchange took place:

Q . . . However, what I'm going to do with this case is -- I'm going to, I'm going to grant benefits. I'm not going to go all the way back to '95, I don't see any justification for that.

_____

[4] Plaintiff's other due process claims are unrelated to her due process claim concerning the ALJ's decision not to reopen her prior application for DIB benefits. Plaintiff alleges she was denied procedural due process by the ALJ's statement at the December 2003 hearing that he was inclined to grant benefits. As is fully discussed below, the ALJ's statement was not a denial of procedural due process because the ALJ never stated he was granting benefits and his written decision clearly denied benefits. More importantly, the ALJ did not state he was inclined to reopen the prior denial of benefits. Likewise, Plaintiff complains the ALJ did not proffer Dr. Cassada's treatment note dated May 27, 2004 to her and afford her the opportunity to comment on it when the ALJ obtained it after the December 2003 hearing [Doc. No. 11 at 7]. However, Dr. Cassada's May 27, 2004 treatment note cannot possibly relate to the decision whether or not to reopen the 1999 DIB claim. *See Hall v. Sec'y of Health and Human Servs.*, No. 88-1453, 1989 WL 16855, * 3 (6th Cir. Feb. 17, 1989) (evidence from 1982 was minimally probative to the determination of plaintiff's disability prior to the expiration of his insured status in1981). Dr. Cassada's treatment May 2004 treatment notes were simply too remote in time to have any bearing on the decision to reopen the 1999 DIB determination.

A       Okay.

Q       You start in 2001.  It's not showing signs of moderate neuropathy in the left lower extremity and that apparently does progress and you have to have, you have to have both -- and it looks to me like it's not resolved yet.  Doctor wants to see you back in six months to see where you stand.

        . . .

        So, what I propose to do is –

A       Oh, well, that was done in May.  I seen him last month.

Q       Uh-huh.

A       I saw him last month.

        . . .

A       And the, the electro was good in my legs all the way down to my ankle and then my feet there are hardly any circulation left in my feet.

Q       Okay.  So this is something we don't have?

A.      Right, right . . .

Q       Can you get this for us?  Do you have the doctors --

A       I don't have it.

Q       . . . We will write to Dr. Cassada, okay, and get that report.

        . . .

Q       So I'll hold up on making a judgment call -- if the doctor is telling me that you're, you're condition hasn't improved, okay, which you're suggesting that is so, I'll get the latest report and let's look at what that says.

A.      Okay.

Q       So if he's, if he feels that you're significantly effected here, then there's no point in putting any kind of limitation on, on this disability.

26

> But at this point I won't make you a promise, I'm inclined to grant benefits. I'm inclined, okay? So don't read any more of that. Let me look at the --

A       I won't but at least you didn't say no.

[Tr. 322-23]. At the conclusion of the hearing the ALJ stated, "[a]ll right, then we'll take this under advisement and we'll get this resolved as quickly as we can" (Tr. 324).

The ALJ statements indicate that, while he was "inclined to grant benefits," he had not yet decided the issue (Tr. 322-25). The ALJ expressly qualified the statement he was inclined to grant benefits by stating he was not promising such an outcome (Tr. 323). Taken as a whole, the ALJ's statements indicate he did not believe Plaintiff was disabled from her alleged disability onset date and he did not consider Plaintiff disabled before she attained age 50 (Tr. 320-22). Thus, based on all of the ALJ's statements, the Plaintiff could not reasonably have been assured she would be awarded benefits.

In *Huff v. Barnhart*, 126 Fed. Appx. 85, 87 (4th Cir. Feb. 1, 2005), the plaintiff claimed the ALJ found him disabled at the administrative hearing, but "reversed" his decision when he issued a written decision dismissing the plaintiff's second application for benefits. The Fourth Circuit rejected the plaintiff's contention stating even "assuming that the ALJ's comments at the hearing could fairly be construed as a finding of disability, 'the ALJ's written decision, not his questions at the hearing, control the findings subject to review.'" *Id.* at 87-88 (quoting *Woods v. Barnhart*, No. 03-2593-KJV, 2004 WL 1558794, * 8 (D. Kan. July 12, 2004)).

Contrary to the Plaintiff's contention, the ALJ did not "reverse" an award of benefits made during the hearing because his written decision, not his somewhat equivocal comments during the administrative hearing, constitute the Commissioner's decision. Therefore, as the ALJ did not

27

"reverse" a decision to award benefits at the hearing in his subsequent written decision, Plaintiff had

no due process right to present comments or arguments as to the ALJ's alleged "reversal." The ALJ

accorded the Plaintiff a full and fair opportunity to make comments and present arguments at the

administrative hearing and even agreed to hold the record open for a period of time so she could

present evidence after the hearing. Plaintiff was not denied due process, *i.e.*, notice and opportunity

to be heard,[5] as she was given the opportunity to testify at length about her symptoms and

limitations. Moreover, Plaintiff has neither shown how her testimony was curtailed by the ALJ's

statements nor identified any additional testimony she would have given but for the ALJ's

comments.

### Due Process Claims About Remand

After the hearing, the ALJ solicited updated information from Dr. Cassada based on

Plaintiff's statement there were recent lower extremity test results and treatment notes not in the

record (Tr. 143, 322-24). Dr. Cassada subsequently submitted a treatment note dated May 27, 2004

and a lower arterial examination report of the same date (Tr. 291-92). Plaintiff contends remand is

required because the ALJ did not proffer these materials to her and afford her the opportunity to

comment on them [Doc. No. 11 at 7]. The ALJ's failure to proffer the May 27, 2004 materials,

however, was harmless as those reports have no relevance to the time period prior to the expiration

of Plaintiff's insured status for DIB benefits. *See Nagle v. Commissioner of Social Security*, No. 98-

---

[5] The Commissioner argues the Sixth Circuit has not explicitly held a claimant who has been denied benefits has a property interest subject to the protections of procedural due process [Doc. No. 18 at 17]. As recognized by the Commissioner, however, this is an issue that need not be decided because, even assuming Plaintiff had such a property interest subject to due process protections, her due process claims fail.

3984, 1999 WL 777355, * 1 (6th Cir. Sep. 21, 1999) (evidence dating from a time outside the insured period is only minimally probative and can only be considered to the extent it reflects a claimant's health prior to the expiration of her insured status) (citing *Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). The ALJ did not rely on the May 27, 2004 materials, and Plaintiff can show neither harm nor a denial of due process from the ALJ's failure to proffer them to her under the circumstances.

Therefore, it is **RECOMMENDED** that: (1) the decision of the Commissioner be **AFFIRMED**; (2) the Defendant's motion for summary judgment [Doc. No. 17] be **GRANTED**; and (3) the Plaintiff's motion for summary judgment [Doc. No. 10] be **DENIED**.

### Claims Related to the Filing of the Administrative Record/Transcript

Plaintiff also claims her due process rights were violated by the Commissioner's failure to include important record evidence, at least in the Commissioner's initial filing of the administrative record/transcript [Doc. No. 11 at 8-9]. In order to address this argument, an overview of the filings in this case is helpful. Plaintiff filed her complaint on April 15, 2005 [Doc. No. 1], and the Commissioner filed her answer to the complaint on June 17, 2005 [Doc. No. 4], along with the administrative record/transcript [Doc. No. 6]. On August 15, 2005, Plaintiff filed her motion for a summary judgment [Doc. No. 10], along with a memorandum in support [Doc. No. 11]. The Commissioner filed her motion for a summary judgment on November 15, 2005 [Doc. No. 17], along with a memorandum in support [Doc. No. 18], and a supplemental administrative record/transcript [Doc. No. 21].

On November 16, 2005, Plaintiff filed a motion seeking a default judgment under Fed. R. Civ. P. 55 and/or a new briefing schedule on the ground the Commissioner failed to timely file the

complete administrative record/transcript as required by 42 U.S.C. § 405(b) [Doc. No. 20]. The Commissioner filed a response to the motion for a default judgment on December 6, 2005 [Doc. No. 24-1], with the declaration of Nancy L. Bingaman, the Assistant Regional Counsel for the Commissioner ("Bingaman") [Doc. No. 24-2 at ¶ 1]. On December 12, 2005, the Court issued an order stating the merits of the motion for default would be addressed in its report and recommendation, and granting Plaintiff's request to be allowed to file a supplemental dispositive motion and memorandum [Doc. No. 25].

Then, on January 6, 2006, Plaintiff filed a supplemental brief in support of her motion for a summary judgment [Doc. No. 26], and a motion for sanctions against the Commissioner pursuant to Fed. R. Civ. P. 11 [Doc. No. 27]. However, on January 13, 2006, Plaintiff filed a notice withdrawing her motion for sanctions [Doc. No. 28]. The Commissioner filed its response to the motion for default on January 19, 2006 [Doc. No. 29].

Addressing the merits of the claim for default judgment, Bingaman's declaration states in pertinent part that Plaintiff's complaint made no allegations concerning the ALJ's refusal to reopen the decision on Plaintiff's prior application for DIB benefits [Doc. No. 24-2 at ¶ 2]. Therefore the transcript of the administrative record of the proceedings in connection with the Plaintiff's June 12, 2002 application for DIB benefits was filed along with the Commissioner's answer [*id.* at ¶ 4]. Bingaman's declaration further states:

> Materials pertaining to a prior claim are not generally included in the administrative record because the decision of an administrative law judge not to reopen a decision on a prior application is not subject to judicial review absent a colorable constitutional claim. Plaintiff's complaint did not allege any impropriety with regard to the issue of reopening. Therefore, there was no reason to include the materials related to Plaintiff's prior application in the record filed with

30

Defendant's answer. Plaintiff raised a reopening issue in her brief, couched in constitutional terms, and claimed that the materials pertaining to the decision on her prior claim should have been in the record. It is not the Agency's practice to routinely require a plaintiff to amend her complaint when additional issues are raised in a brief which were not specifically stated in the complaint. On October 26, 2005, after discussion with her supervisors, the undersigned requested that the record be supplemented with the materials relating to the prior claim, to assist the Court in dealing with the reopening issue raised by Plaintiff. On that same day, the undersigned contacted the U.S. Attorney's office to request a second extension of time to file Defendant's brief, so that the Agency would have time to compile the supplemental record.

. . .

The supplemental record, containing materials relevant to Plaintiff's prior application, was certified by the Office of Hearings and Appeals on November 3, 2005.

[*id.* at ¶¶ 10, 12] (internal citations omitted).

In her supplemental pleading, Plaintiff contends the filing of a supplemental administrative record/transcript "proves that the government did not correctly, or accurately certify the Record in this matter as required by law." [Doc. No. 26 at 1]. Plaintiff states the Commissioner was "trying to hide the existence of the earlier record by rather crudely covering over the 'B' portion of the exhibit list showing that this was the second hearing level appeal of the claimant" and "has now been caught and admitted to sitting on the 'supplemental' portion of the full Record from this Court's review." [*Id.* at 1-2]. The Commissioner states while Plaintiff may be correct that the exhibit list at the beginning of the administrative record filed with the answer was altered to delete the "B" before each exhibit number, the allegation the alteration was made with an intent to "hide" something or to deprive the Court of materials necessary for judicial review is meritless [Doc. No. 29 at 2]. The Commissioner argues when the time came to prepare the administrative record for

31

judicial review of the September 2004 ALJ decision, *i.e.*, the decision on Plaintiff's application of June 2002, the "B" preceding each of the exhibit numbers related to the prior application was likely deleted because it was not necessary for the file related to the prior application to be included in the administrative record. Thus, the Commissioner argues there was no need to distinguish the exhibit numbers connected to the June 2002 application from the exhibit numbers connected to the January 1999 application [*id.* at 3].

As noted, Plaintiff moved for a default judgment under Fed. R. Civ. P. 55 for failure to timely file the complete administrative record as required by 42 U.S.C. § 405(g) [Doc. No. 20 at 1]. Title 42 U.S.C. § 405(g) states in pertinent part:

> Any individual after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . . *As part of the Commissioner's answer the Commissioner of Social Security shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based.* The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner. . . .

42 U.S.C. § 405(g) (emphasis added).

Fed. R. Civ P 55(e) states:

> **(e) Judgment Against the United States.** No judgment by default shall be entered against the United States or an officer or agency thereof unless the claimant establishes a claim or right to relief by evidence satisfactory to the court.

"Courts considering the interaction of § 405(g) and Rule 55(e) have held that default judgment may not be entered against the [Commissioner] 'without considering the transcript of the record.'"

*Williams v. Califano*, 593 F.2d 282, 284 (7th Cir. 1979) (quoting *Poe v. Matthews*, 572 F.2d 137 (6th Cir. 1978)). "[E]ven in default proceedings judgment . . . cannot be entered without the record, and must be based on the record alone." *Id.* at 284-85. *See also Alameda v. Secretary of Health, Ed. and Welfare*, 622 F.2d 1044, 1047 (1st Cir. 1980) ("We read pertinent and compelling case authority as barring a court from granting relief to a social security claimant, even in a context of default by the [Commissioner], unless the claimant establishes his claim by introducing some evidence that the [Commissioner's] conclusions are not supported by substantial evidence.")

As set forth above, the Court has reviewed the evidence of record – both the original and supplemental transcripts – and has concluded the Commissioner's decision denying benefits to Plaintiff is supported by substantial evidence. Further, this is not a situation where the Commissioner has failed or refused to file the administrative record/transcript. When the Plaintiff filed her motion for summary judgment and supporting brief and appeared to raise a colorable constitutional claim concerning the ALJ's decision not to reopen the denial of her prior application for DIB benefits, the Commissioner then filed the supplemental administrative record/transcript containing materials related to the denial of Plaintiff's prior application for DIB benefits. Although Plaintiff may have been inconvenienced by the approximately five month delay between the filing of the original administrative record/transcript and the supplemental administrative record/ transcript, the Court afforded the parties an opportunity to file supplemental pleadings based upon the filing of the supplemental administrative record/transcript, and Plaintiff so filed. There is no indication the administrative record/transcript, as supplemented, is incomplete or misleading in any way, and thus the record is adequate for judicial review. *See Hollon v. Commissioner of Social Sec.*, 447 F.3d 477 (6th Cir. 2006).

The Court concludes Plaintiff has failed to establish she is entitled to a default judgment pursuant to Fed R. Civ. P. 55(e) or that her due process rights have been violated; and, therefore, the decision of the Commissioner should be affirmed. Accordingly, it is **RECOMMENDED** that: (1) Plaintiff's motion for a default judgment [Doc. No. 20] be **DENIED**, and (2) Plaintiff's motion for sanctions [Doc. No. 27] be **STRICKEN** as **MOOT**.

<u>**Conclusion**</u>

Having carefully reviewed the administrative record and the briefs of the parties filed in support of their respective motions, for the reasons stated above it is **RECOMMENDED**[6]:

(1)    Plaintiff's motion for summary judgment [Doc. No. 10] be **DENIED**;

(2)    Defendant's motion for summary judgment [Doc. No. 17] be **GRANTED**;

(3)    Plaintiff's motion for a judgment by default [Doc. No. 20] be **DENIED**;

(4)    Plaintiff's motion for sanctions [Doc. No. 27] be **STRICKEN** as having been rendered **MOOT**;

(5)    Judgment be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure **AFFIRMING** the Commissioner's decision which denied benefits to the Plaintiff;

---

[6] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

and

(6)     This action be **DISMISSED**;


                              s/*Susan K. Lee*
                              SUSAN K. LEE
                              UNITED STATES MAGISTRATE JUDGE